## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| Thomas E. Perez, Secretary, U.S. Department of Labor, )<br><br>Plaintiff, )<br><br>v. )<br><br>Amalgamated Transit Union Local 1700, )<br><br>Defendant. ) | Civil No. 14-cv-01268 (APM) |

## MEMORANDUM OPINION

### I.      INTRODUCTION

Defendant Amalgamated Transit Union Local 1700 ("Local 1700") last held its triennial election of officers in November 2013.  Despite the large number of ballots—almost 3,000—sent to eligible members, some of the races turned on only a handful of votes.  The smallest margin of victory was a mere 13 ballots.

Every eligible union member has a right to vote, and unions have a legal obligation to take reasonable steps to secure this right for each member.  Here, the Secretary of the U.S. Department of Labor alleges that Local 1700 failed to ensure that certain members were given a fair opportunity to vote in the November 2013 election.  Specifically, the Secretary contends that Local 1700 unlawfully encumbered the voting rights of 35 of its members when it failed to mail each of them a new ballot, after the ballots initially mailed to them were returned as undeliverable but affixed with expired forwarding addresses.  Further, the Secretary argues that Local 1700's failure to re-mail those 35 ballots affected the outcome of the election.

On July 25, 2014, the Secretary filed this suit alleging that Local 1700's inaction violated Section 401(e) of the Labor-Management Reporting and Disclosure Act of 1959. He asks the court to declare void the previous election of union officers and direct the union to conduct a new election under the supervision of the Department of Labor. On June 6, 2015, Plaintiff and Defendant filed cross-motions for summary judgment.

Upon consideration of the parties' submissions and the record evidence, the court grants Plaintiff's Motion for Summary Judgment and denies Defendant's Motion for Summary Judgment. The court will refrain from instituting a remedy, however, pending further briefing as described below.

## II.    BACKGROUND

### A.    Factual Background

Defendant Local 1700 ("Local 1700") is a labor organization, which has approximately 3,000 members, and is affiliated with the Amalgamated Transit Union. Mem. in Support of Def.'s Mot. for Summ. J. [hereinafter Def.'s Mot.], ECF No. 21, LX 3, Decl. of Sesil Rubain, ECF No. 21-5 [hereinafter Rubain Decl.], ¶¶ 1, 4. It represents "bus operators throughout the continental United States and Canada who work for Greyhound Lines, Inc." Def.'s Mot. at 2; Rubain Decl. ¶¶ 1, 4. Pursuant to its bylaws, Local 1700 holds an election for officers every three years. Rubain Decl. ¶ 13. Its last election, conducted by mail ballot, began in November 2013 and concluded in December 2013. See Def.'s Mot., LX 15, ECF No. 21-17 [hereinafter Notice of Election], at 3-4.

### 1.    Notification of Members Regarding the Election

Local 1700 made several different attempts throughout 2013 to notify its members about the upcoming election. In January 2013 and June 2013, Local 1700 distributed a notice—which mentioned the upcoming election—to union stewards, who were instructed to post the notice on

bulletin boards at all Greyhound locations.  Rubain Decl. ¶ 19; Def.'s Mot., LX 9, ECF No. 21-11 [hereinafter LX 9]; Def.'s Mot., LX 10, ECF No. 21-12 [hereinafter LX 10].  And in September 2013, Local 1700 posted a more detailed notice on its website.  Def.'s Mot., LX 11, ECF No. 21-13 [hereinafter LX 11].  These notices informed members that they could update their mailing addresses in a variety of ways:  by providing the updated information to a supervisor; telephoning or faxing the Local 1700 office; emailing the Financial Secretary/Treasurer Sesil "Wayne" Rubain; or visiting Local 1700's website.  Rubain Decl. ¶ 19; LX 9; LX 10; LX 11.

Local 1700 also used its organizational newsletter, "Solidarity Road," to advise members of the upcoming election.  Rubain Decl. ¶¶ 21-22; Def.'s Mot., LX 12, ECF No. 21-14 [hereinafter LX 12]; Def.'s Mot., LX 13, ECF No. 21-15 [hereinafter LX 13].  The Spring 2013 edition apprised members that all Local 1700 Executive Board seats were up for election and detailed the election timeline.  LX 12 at 2.  The Fall 2013 edition similarly reminded members of the upcoming election and also urged them to update their contact information by calling or faxing Local 1700 or by changing their information on the Local 1700 website.  LX 13 at 5.

Finally, on September 23, 2013—two weeks before the voting period began—Local 1700 sent a "Notice of Nomination and Election of Officers" (the "Election Notice") to the most current mailing address on file for each member.  Rubain Decl. ¶ 26; Notice of Election at 1.  The Election Notice informed members that ballots would be mailed to them on November 8, 2013, and noted that "[a]ny member who does not receive a ballot by November 15, 2013 . . . will be able to . . . request a duplicate ballot."  Notice of Election at 3-4.  Members further were told that their completed ballots would have to be received by Local 1700 on or before December 3, 2013, to be counted in the election.  *Id.* at 4.  The Election Notice did not explicitly remind members to update their addresses, nor did it provide information about how members might do so.  *See generally id.*

at 2-4.  Of the 2,799 Election Notices mailed, 132 were returned as undeliverable.  Rubain Decl. ¶ 28.

     2.     *Local 1700's Mailing List*

To send the mailings described above, as well as other membership updates, Local 1700 maintains a list of addresses for its members.  Rubain Decl. ¶ 5.  This list, known as the "Multi Union Membership System" ("MUMS"), generally is derived from contact information provided by union members to their employer, Greyhound.  *Id.* ¶¶ 5, 7.  Each month, the Local receives three updated files from Greyhound: a Dues Payment file; a Greyhound Driver Status Changes file; and a Non-Driver Employee Status Changes file.  *Id.* ¶ 7.  The latter two files (collectively, the "Monthly Report"), which contain the most current address information that Greyhound has on record, are imported into the MUMS system.  Def.'s Opp'n to Pl.'s Mot. for Summ. J., ECF No. 25 [hereinafter Def.'s Opp'n], LX 24, Supplemental Decl. of Luke Franco, ECF No. 25-2 [hereinafter Suppl. Franco Decl.], ¶ 2.  If the information listed in the Monthly Report differs from the information in MUMS, MUMS is overwritten and the Greyhound-provided address is input into the system instead.  *Id.* ¶ 3.

Local 1700 also provides other means by which members can update their addresses with the union: they either can call or email the union or change their contact information on the Local 1700 website.  Mem. of P. & A. in Support of Pl.'s Mot. for Summ. J. [hereinafter Pl.'s Mot.], ECF No. 18, Gov Exh 1, Dep. of Sesil Rubain, ECF No. 18-2 [hereinafter Rubain Dep.], at 17:21- 18:8.  These changes, however, are not necessarily permanent.  If an employee does not *also* update Greyhound as to his new address, any changes entered into MUMS automatically will be overwritten at the end of the month by the un-updated address listed on the Monthly Report provided by Greyhound.  *Id.* at 91:10-92:1; Suppl. Franco Decl. ¶ 6.

On several occasions, when Local 1700 has sent a mailing, it also has requested that the vendor hired to mail its materials review and verify the union's mailing list. Pl.'s Mot., Gov Exh 16, ECF No. 18-17; Pl.'s Mot., Gov Exh 17, ECF No. 18-18; Pl.'s Mot., Gov Exh 18, ECF No. 18-19 [hereinafter Gov Exh 18]. For example, Local 1700 hired Rockman and Sons Publishing ("Rockman") to mail the September 2013 Election Notice. Rubain Dep. at 40:15-20, 64:9-12. Before sending the Election Notice, Rockman used a computer software program to correct zip codes and verify the addresses on Local 1700's mailing list. *Id.* at 66:17-20; Pl.'s Mot., Gov Exh 10, ECF No. 18-11. Rockman also ran a National Change of Address (NCOA) Report, which compared the union's mailing list to postal service forwarding records and amended the mailing list accordingly. Pl.'s Mot. at 5-7; Gov Exh 18. The resulting revised addresses were used to send Local 1700's mailing; they were not, however, used to update MUMS. Rubain Dep. at 68:21-69:10.

Notwithstanding Local 1700's efforts to maintain an accurate mailing list, the U.S. Postal Service ("USPS") sometimes returns mail to the union because it is undeliverable—*i.e.*, the address is incorrect for some reason. Local 1700's Financial Secretary/Treasurer Rubain is in charge of handling such mail. Rubain Decl. ¶ 9. His method for dealing with the mail depends on the reason that the mail was returned—whether it is (1) mail returned as undeliverable without a forwarding address, or (2) mailed returned as undeliverable with an expired forwarding address. Def.'s Mot., LX 22, ECF No. 21-24 [hereinafter LX 22], at 3-5; Def.'s Opp'n, LX 23, Supplemental Decl. of Sesil Rubain, ECF No. 25-1 [hereinafter Suppl. Rubain Decl.], at ¶¶ 10-15.

When Rubain receives the first type of returned mail—mail returned with no forwarding address—he rechecks the union member's address in MUMS, and also consults the "Driver Roster," which is a list containing contact information for approximately 28,000 past, present, and

retired Greyhound drivers from 1993 to the present.  *Id.* at 4; Rubain Decl. ¶ 8; Rubain Dep. at 26:1-8, 72:22-73:12.  The Driver Roster is compiled by Greyhound's Driver Planning Department and is provided to Local 1700 every week through a website link; it is separate from the Monthly Report also provided by Greyhound.  LX22 at 4.  If the address used for Local 1700's mailing differs from the address listed on the Driver Roster, Rubain re-mails the document to the address listed on the Roster and updates MUMS accordingly.  *Id.* at 4-5.  If the address used for Local 1700's mailing is the same as the address listed on the Driver Roster, Rubain consults MUMS to determine whether an updated address had been received from Greyhound.  *Id.* at 4.

The second category of returned mail—mail returned with an expired forwarding address—requires additional explanation.  The USPS will forward mail from an old address to a new address only for a period of one year.[1]  After one year, any mail sent to the old address will be returned to the sender as undeliverable and, in some cases, the returned envelope will note the forwarding address on file with the USPS.  Upon receipt of such returned mail, Rubain turns to the same references as he would if he had received the first type of mail.  First, he looks up the member's address in MUMS to determine when the address was last updated.  Suppl. Rubain Decl. ¶ 13.  He then checks the most recent Driver Roster.  *Id.*  If the address in MUMS is less than six months old and matches the address in the Driver Roster, Rubain's practice is to treat the MUMS address as the "most current address" and not resend the mail to the expired forwarding address. *Id.*  If, however, the MUMS address is more than six months old, Rubain will then re-mail the item to the expired forwarding address because, in that case, he believes that the address on file with Postal Service "could be newer" than the one in MUMS.  *Id.*

---

[1] *See Change of Address – The Basics*, U.S. Postal Serv., http://faq.usps.com/?articleId=221220 (last visited Mar. 11, 2016).

3.      *The 2013 Election*

Local 1700 hired a company known as TrueBallot, Inc. ("TrueBallot"), to deal with many of the administrative aspects of the 2013 election.  Rubain Dep. at 27:17-19; Rubain Decl. ¶ 18. TrueBallot was employed to mail the election ballots, receive return ballots, and tally and certify the results of the vote.  Rubain Decl. ¶ 18.  It addressed the ballots based on a mailing list provided by Local 1700 on November 6, 2013.  Pl.'s Mot., Gov Exh 9, Dep. of John Seibel,  ECF No. 18-10 [hereinafter Seibel Dep.], at 58:8-61:5.  The mailing list had been updated by the Monthly Report on October 31, 2013.  Rubain Decl. ¶ 30.  TrueBallot was not obligated to—and did not— make any attempt to verify the accuracy of the list using software programs or NCOA reports. Pl.'s Mot., Gov Exh 15 [hereinafter Gov Exh 15], ECF No. 18-16.

On November 8, 2013, TrueBallot mailed 2,903 ballots to Local 1700's members.  Rubain Decl. ¶¶ 31-32.  Of the mailed ballots, 184[2] were returned as undeliverable.  *Id.* ¶ 32.  The USPS affixed 47[3] of these returned ballots with labels indicating that the intended recipient had filed a change of address notice and requested that their mail be forwarded, but the forwarding time had expired.  *Id.*  The affixed labels expressly listed each intended recipient's forwarding address.  *Id.*

Of the 47 members to whom these ballots were addressed, nine requested and received duplicate ballots, and three were determined not to be in good standing at the time of the election. Pl.'s Mot., Gov Exh 21, Decl. of Brian Lucy, ECF No. 18-22 [hereinafter Lucy Decl.], ¶¶ 10, 12.

---

[2] In his Complaint and in the Statement of Material Facts attached to his Motion for Summary Judgment, Plaintiff states that 181 ballots were returned as undeliverable. Compl., ECF No. 1, ¶ 12; Pl.'s Mot., Statement of Material Facts, ¶ 42.  Defendant, however, states that 184 ballots were returned as undeliverable. Def.'s Mot., Statement of Material Facts, ¶ 45.  As Defendant admits that 184 ballots were returned as undeliverable, and the change in number is not material to the court's decision, the court uses the number provided by Defendant.

[3] In his Complaint, Plaintiff states that 48, rather than 47, ballots were returned as undeliverable with forwarding addresses affixed.  Compl. ¶ 12. In his Motion for Summary Judgment, however, Plaintiff changed that number to 47. Pl.'s Mot., Statement of Material Facts, ¶ 50.  As Defendant admits that 47 ballots were returned as undeliverable with forwarding addresses affixed, Def.'s Mot., Statement of Material Faces, ¶ 48, and the change in number is not material to the court's decision, the court uses the number provided by Defendant and by Plaintiff in his Motion for Summary Judgment.

The remaining 35 members did not request a duplicate ballot.  Rubain Decl. ¶ 38.  They therefore never received a ballot and did not vote in the election.

Financial Secretary/Treasurer Rubain was in charge of election procedure.  Rubain Dep. 11:4-6.  He used TrueBallot's website to monitor the status of the ballot mailing.  Rubain Decl. ¶ 33.  When a ballot was returned as undeliverable, the returned mailing would be noted as "undeliverable" on TrueBallot's online platform.  Rubain Dep. at 72:3-18.  The website, however, did not distinguish between mail that was undeliverable without a forwarding address and mail that was undeliverable *with* an expired forwarding address.  Rubain Decl. ¶ 38.  As a result, by simply looking at the TrueBallot website, Rubain could not tell which ballots were affixed with expired forwarding addresses and which were not.  Rubain also never inquired with TrueBallot as to why any particular ballot was returned as undeliverable.  Rubain Dep. at 72:19-21, 76:3-77:10.  Nor did he ever ask to see the returned envelopes.  Rubain Dep. at 76:3-6.  It is thus undisputed that Rubain was unaware that the 35 ballots mentioned above were affixed with expired forwarding addresses.

Rubain did, however, take some action after learning that these ballots had been returned as undeliverable.  He checked the address to which each member's ballot had been sent against the member's contact information in MUMS and the Greyhound Driver Roster.  Rubain Decl. ¶¶ 33, 36.  But neither database provided him with more up-to-date addresses for any of the 35 members.  *Id.*  And Rubain elected not to try other means of communication—phone, email, etc.—to reach the members who had not received ballots.  *Id*.  As a result, Rubain did not resend a ballot to any of the 35 members whose ballots had been returned as undeliverable with an expired forwarding address.  *Id.* ¶ 36.  These members therefore did not vote in the election.

After the voting period had ended, TrueBallot tallied the ballots.  *See* Pl.'s Mot., Gov Exh 23, ECF No. 18-24.  For two positions—President and Alternate Delegate—the margin of victory was less than 35 votes.  Rubain Decl. ¶ 39.  The successful candidate for President won the election by 26 votes,[4] while the smallest margin of victory among the six candidates for Alternate Delegate was 13.  *Id*.  All six candidates were "elected" for Alternate Delegate, but were to serve only as needed in the order as ranked by number of votes received.  *Id.*; Notice of Election at 1.

### B.     Procedural Background

On December 4, 2013, Local 1700 received by facsimile a letter from Johnny Norris, a Local 1700 member in good standing, which protested the 2013 election.  Compl., ECF No. 1, ¶ 8; Def.'s Mot., LX 17, ECF No. 21-19; Pl.'s Mot., Gov Exh 24, ECF No. 18-25.  On March 11, 2014, after exhausting the remedies available to him within Local 1700, Norris timely filed a complaint with the U.S. Department of Labor's Office of Labor-Management Standards.  Compl. ¶ 9; Answer ¶ 9; *see* Pl.'s Mot., Gov Exh 26, ECF No. 18-27.  The Department of Labor investigated the complaint and, after finding probable cause to believe that a violation of Section 401(e) of the Labor-Management Reporting and Disclosure Act had occurred, filed a lawsuit against Local 1700 on July 25, 2014.  Compl. ¶ 10; Answer ¶ 10.

Nearly a year later, on June 5, 2015, after discovery had concluded, Plaintiff and Defendant filed cross-motions for summary judgment.  *See generally* Pl.'s Mot.; Def.'s Mot.  On July 2, 2015, both parties filed oppositions.  The court now turns to these motions.

## III.     LEGAL STANDARD

A court will grant summary judgment only if a movant shows that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R.

---

[4] TrueBallot's initial tally showed that the winning candidate had won by 25 votes, but a recount by the Department of Labor concluded that the correct margin was 26.  Lucy Decl. ¶ 4.

Civ. P. 56(a).  A dispute is "genuine" only if a reasonable fact-finder could find for the nonmoving party, while a fact is "material" only if it is capable of affecting the outcome of litigation.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248-49 (1986).  A non-material factual dispute is insufficient to prevent the court from granting summary judgment.  *Id.* at 248.  In making its determination, the court reviews all "evidence . . . in the light most favorable to the non-moving party."  *N.S. ex rel Stein v. District of Columbia*, 709 F. Supp. 2d 57, 65 (D.D.C. 2010) (referencing *Anderson*, 477 U.S. at 255).

On cross-motions for summary judgment "each side concedes that no material facts are at issue," although this applies "only for the purposes of [each side's] own motion" and does not mean that a "party [has] waive[d] the right to a full trial on the merits."  *Sherwood v. Wash. Post*, 871 F.2d 1144, 1147 n.4 (D.C. Cir. 1989) (quoting *McKenzie v. Sawyer*, 684 F.2d 62, 68 n.3 (D.C. Cir. 1982), *abrogated on other grounds by Berger v. Iron Workers Reinforced Rodmen, Local 201*, 170 F.3d 1111 (D.C. Cir. 1999)); *see also Hodes v. Dep't of Treasury*, 967 F. Supp. 2d 369, 373 (D.D.C. 2013).  The court will "grant summary judgment only if one of the moving parties is entitled to judgment as a matter of law upon material facts that are not genuinely disputed."  *GCI Health Care Ctrs., Inc. v. Thompson*, 209 F. Supp. 2d 63, 67 (D.D.C. 2002) (citations omitted).

## IV.  DISCUSSION

### A.  The Right to Vote Under Section 401(e) of the LMRDA

Congress enacted the Labor-Management Reporting and Disclosure Act ("LMRDA") of 1959 to set "standards for labor-management relations"; "protect[ ] the rights of employees and the public"; and "eliminate or prevent improper practices on the part of labor organizations, employers, labor relations consultants, and their officers and representatives."  29 U.S.C. §§ 401(a)-(c).  In an effort to achieve these goals, Congress established guidelines and procedures

to be followed in union elections. *See generally* 29 U.S.C. § 481. One of these provisions, section 401(e) of the LMRDA, requires that "every member in good standing . . . shall have the right to vote for . . . the candidate or candidates of his choice." *Id.* § 481(e). Plaintiff argues that by failing to resend the 35 undelivered ballots with expired forwarding addresses, Defendant Local 1700 violated this provision of the LMRDA. *See* Pl.'s Mot. at 12-16.

Courts have interpreted section 401(e) to require unions to take "reasonable steps" to ensure that each member in good standing is given a fair opportunity to vote.[5] *See Dole v. Graphic Commc'ns Int'l Union, AFL-CIO, CLC*, 722 F. Supp. 782, 786 (D.D.C. 1989) (holding that section 401(e) "requires [ ] that unions take all reasonable steps to ensure that its members are given a fair opportunity to vote"); *Marshall v. Am. Postal Workers Union, AFL-CIO*, 486 F. Supp. 79, 83 (D.D.C. 1980) (finding a violation of section 401(e) where the union failed to "demonstrate[ ] that it ha[d] made adequate efforts to ensure the fairness of the elections"); *Chao v. Local 54, Hotel Emps. & Rest. Emps. Int'l Union*, 166 F. Supp. 2d 109, 120 (D.N.J. 2001) (holding that a violation of Section 401(e) had occurred where the union did not "make sufficient reasonable efforts" to keep its mailing list current and to insure that all members eligible to vote were sent election ballots); *cf. Chao v. Local 290, Plumbers, Steamfitters, Pipefitters and Marine Fitters of the United Ass'n of Journeymen and Apprentices of the Plumbing and Pipefitting Indus. of U.S. and Can.*, Civ No. 06-1359-AC, 2008 WL 920337, *3-4 (D. Or. Apr. 1, 2008) (quoting *Reich v. Dist. Lodge 720, Int'l Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 11 F.3d 1496, 1501 (9th Cir. 1993)) (noting that section 401(e) is "moderated by a 'reasonable efforts' standard," and requiring

---

[5] In its Motion for Summary Judgment, Plaintiff argues that judicial interpretation of section 401(e) requires that unions take "*all* reasonable steps" to ensure their members right to vote. *See* Pl.'s Mot. at 11-13. Relevant case law, however, does not consistently hold that *all* reasonable steps must be taken by the union, or *all* reasonable efforts made, rather than some. Here, this distinction is immaterial. Even if the court applies the more forgiving "reasonable steps" standard—as it does below—Defendant's actions were not reasonable.

a union to "affirmatively show that it has made reasonable efforts to maintain an accurate mailing list" in order to successfully defend against an alleged violation of section 401(e)'s election notice mailing requirement).

In order to determine whether a union took reasonable steps to ensure its members' franchise, a court may consider a variety of factors. For example, the court may look to the existence of alternative actions that could have been taken by the union. *See Graphic Commc'ns*, 722 F. Supp. at 786 (concluding that a union did not meet its obligation to ensure that its members were given a fair opportunity to vote where "[t]here were many less drastic measures that [the union] could have taken"); *Local 54*, 166 F. Supp. 2d at 118-9 (comparing methods used by a union to find addresses to update its mailing list with the methods used by the union to find members to collect dues). It may review the administrative practicality of such alternatives. *See Am. Postal Workers Union*, 486 F. Supp. at 83 (noting that "[t]here is no indication that the administrative problems [with mailing ballots] are insuperable"). Or it may evaluate whether the union was aware that it might face difficulties reaching its members. *Local 54*, 166 F. Supp. 2d at 118-20 (noting, before holding that a violation of 401(e) had occurred, that "[a]s the significant number of known invalid addresses in the union's records demonstrates, the union's usual approach to keeping its address lists current had proven ineffective").

1.   *Reasonableness of the Actions Taken by Local 1700*

The parties have devoted significant portions of their briefs, and many pages of exhibits, to the specifics of the process generally used by Local 1700 to maintain and update MUMS, its mailing list database. *See, e.g.*, Pl.'s Mot. at 17-20; Def.'s Mot. at 2-7, 11-15; Pl.'s Mem. of P. & A. in Opp'n to Def.'s Mot. for Summ. J., ECF No. 24, at 3-8, 19-23; Def.'s Opp'n at 3-12. But Local 1700's general practices regarding the maintenance of its mailing list are largely immaterial

to resolving the key issue before the court.[6]   That critical issue is whether Local 1700 acted unreasonably, and thus violated section 401(e), when it did not re-mail ballots that were returned with expired forwarding addresses.

Here, the court finds that Defendant did not act reasonably.   The Secretary has shown that Defendant "simply [did] not . . . [make] adequate efforts to ensure the fairness of the elections." *Am. Postal Workers Union*, 486 F. Supp. at 83.   Faced with the actual knowledge that its mailing list had incorrect addresses for 35 members *and*, critically, the imputed knowledge that the USPS had provided Local 1700 with those members' forwarding addresses, Local 1700 was required to take the practical, straightforward step of resending the ballots to those members at their forwarding addresses.

i.   <u>The material facts are not in dispute</u>

The critical facts are undisputed.   On October 31, 2013, Local 1700 uploaded the most recent Monthly Report it had received from Greyhound into MUMS, Rubain Decl. ¶ 30, and sent the resulting mailing list to TrueBallot on November 6, 2013, Seibel Dep. at 58:8-61:5.   Although Local 1700 had asked previous vendors to use address verification software and NCOA reports to review and correct its mailing list, neither TrueBallot nor Local 1700 performed such a review on the list used to address the ballot packages.   Gov Exh 15.   Nonetheless, on November 8, 2013, TrueBallot mailed 2,903 ballot packages to the members of Local 1700 so that they could participate in the union election.   Rubain Decl. ¶¶ 31-32.

Of the almost 3,000 ballot packages sent on behalf of Local 1700, 184 were returned as undeliverable by the USPS. *Id.* ¶ 32.   Of these 184 undeliverable packages, 47 were returned with a USPS label indicating that the address to which the package had been sent had an expired

---

[6] Indeed, the parties conceded at oral argument that the court does not need to evaluate Local 1700's general mailing list practices to dispose of the case.   Draft Tr. at 1:19-22; 32:12-23.

forwarding address associated with it.  *Id.*  The expired forwarding address was noted on the USPS

label.  *Id.*  Although Local 1700's Financial Secretary/Treasurer Rubain learned from TrueBallot

that these ballots had been returned, he did not inquire further and did not learn about the expired

addresses.  Nor did he attempt to contact the members for updated information.  Rubain was able

to resolve 12 of the returned ballots either by resending them upon the member's request or by

determining that the ballot belonged to a member ineligible to vote.  Lucy Decl. ¶¶ 10, 12.  The

remaining 35 members did not receive any ballots.  Rubain Decl. ¶ 38.

> ii.    Defendant did not take reasonable steps to determine updated
>        addresses for the ballots returned as undeliverable with expired
>        forwarding addresses

Although the court agrees with Defendant that "it would be unreasonable to construe

[section 401] as requiring perfection," *Am. Postal Workers Union*, 486 F. Supp. at 83, section

401(e) does require that a union take reasonable steps to ensure that its members have a fair

opportunity to exercise their right to vote, *Graphic Commc'ns*, 722 F. Supp. at 786.  And the court

has the authority to decide what is reasonable in this context.  *Marshall v. Local Lodge, 1784, Int'l*

*Ass'n of Machinists & Aerospace Workers, AFL-CIO*, 509 F. Supp. 90, 94 (D. Md. 1981)

("Congress left to the courts . . . the task of determining the reasonableness of a particular election

procedure once it is challenged by the Secretary.").  Here, the court finds Local 1700's failure to

resend ballots to members whose initial ballots were returned with expired forwarding addresses

was unreasonable for four main reasons.

First, "the right of every union member in good standing to vote must require, at a

minimum, that a union take reasonable steps to maintain current mailing addresses for its members

and to distribute election ballots to all those entitled to vote."  *Local 54*, 166 F. Supp. 2d at 120.

A reasonable corollary to that rule is that when a union learns that it has mailed a ballot to an

incorrect address during the course of an election, it must take reasonable steps to mail a ballot to the most up-to-date address known to the union.

Here, before the deadline for members to return ballots had passed, Defendant learned through its agent TrueBallot that it had sent ballots to 184 of its members at the wrong addresses. By definition, none of those addresses could have been current because the ballots were returned as undeliverable.   Local 1700 not only discovered that the mailing addresses on file for those 184 members were invalid, but it also learned that 47 of those members had newer mailing addresses. It also gained a record of these newer addresses because the USPS had affixed the forwarding addresses on file to the returned ballots.   Although Local 1700 did not see these addresses itself, TrueBallot's knowledge was imputable to Local 1700 because TrueBallot was Local 1700's agent. Under the general principles of agency law and vicarious liability, knowledge of the addresses is imputed to Local 1700 despite its lack of actual knowledge.  *Meyer v. Holley*, 537 U.S. 280, 285 (2003); 3 Am. Jur. 2d *Agency* § 243 (2016); *see also* Restatement (Second) of Agency § 219 (1958).   Local 1700 does not dispute that it is charged with its agent's knowledge regarding the returned ballots.  Def.'s Opp'n at 3-4 n.1; Hr'g Draft Tr., Mar. 17, 2016, at 21:19-22:1.

Admittedly, those USPS-affixed forwarding addresses were "expired," meaning that because more than a year had passed, the USPS would no longer forward them automatically to the new address.  But there can be little doubt that the USPS forwarding addresses were at least as current, and almost certainly more current, than the addresses Local 1700 had on file.  After all, Local 1700 knew that the undeliverable mailing addresses it had on file were wrong because they had been returned.  It also knew that for these particular 47 ballots, the member had notified the

USPS of a different mailing address, which had been valid at some point *after* the initial, undeliverable address became invalid.[7]

In other words, the forwarding notice made the initial, undeliverable address invalid—because any mail sent to that original address would be forwarded to a newer address. Because Local 1700 logically should have determined that the expired forwarding addresses noted by USPS were more up-to-date than the addresses it had on record, and because it had no alternatives for 35 of the aforementioned ballots, it was unreasonable for Local 1700 not to resend the ballots to those expired forwarding addresses.[8]

Second, Local 1700's failure to resend the 35 ballots with expired forwarding addresses is unreasonable in light of Rubain's stated practice in dealing with such mailings. The parties did not offer into evidence any "industry standard" against which the court might assess the reasonableness of Local 1700's actions. Therefore, the court looks to Local 1700's prior actions regarding returned mail as a useful indicator of the reasonable steps that should have been taken here. According to Rubain, if Local 1700 receives returned mail with an expired forwarding address provided by USPS and Rubain cannot find an updated address in MUMS or the Driver

---

[7] Local 1700 also had the means to confirm that at least some of the forwarding addresses likely were correct. Using its own technology and staff, Local 1700 determined during the course of litigation that Rubain had manually updated the addresses for four of these remaining ballots within the two months prior to the election, but his updates had been automatically overwritten by the Monthly Report. Suppl. Franco Decl., ¶¶ 8-13. Two of the four manually-updated, overwritten addresses matched the USPS-provided expired forwarding addresses. *Compare id.* ¶¶ 11-14, *with* Pl.'s Mot., Gov Exh 27 [Sealed], ECF No. 20-1, at 10, 12-14.

[8] Defendant notes that when the Election Notice was mailed before the election, the Election Notice was returned as undeliverable for only one of the 35 members whose address is at issue here. Def.'s Opp'n at 2. Even if the court was considering the steps taken by Local 1700 to update its mailing list for distribution of the Election Notice—which it is not—Local 1700 had Rockman, who distributed the Notice, run an address verification and correction program on the mailing list before it sent out the mailing. The Notices may have reached their destinations because the addresses had been corrected. Alternatively, some of the forwarding addresses may have "expired" in the time between the mailing of the Notice and the mailing of the ballots. Finally, the fact that at least one Notice was returned as undeliverable—and the address was not remedied before the ballots were sent—does not help Defendant's case. Instead, it highlights Defendant's failure to act on known changes to members' addresses.

16

Roster, and the address in MUMS is more than six months old, his general practice is to re-mail the item to the USPS-provided address.  Suppl. Rubain Decl. ¶ 13.

Thus, by Rubain's own admission, there are times when he *does forward* returned mail to an expired forwarding address.  Rubain's corresponding assertion that he does not forward such returned mail when MUMS was updated within the last six months, however, makes little sense. If a ballot is mailed to an address listed in MUMS but returned as undeliverable, that address, by definition, is incorrect, and so too is its listing in MUMS.  Therefore, deferring to MUMS, which lists a known incorrect address, regardless of when the address was last updated, is unreasonable. The crux of the issue is this:  the address was verifiably wrong and a better mailing address was available, but Local 1700 did nothing to resend the ballots—even though Rubain admitted to doing so in other instances.

Third, the unreasonableness of Local 1700's inaction here is compounded by its complete lack of effort to determine the members' updated addresses.  As noted, Local 1700 does not dispute that TrueBallot's knowledge of the affixed forwarding addresses can be imputed to the union. Def.'s Opp'n at 3-4 n.1; Draft Tr. at 21:19-22:1.  But the larger problem for Local 1700 is that Rubain effectively did not take any steps to determine whether the ballots had come back with forwarding addresses—even though he was well aware from past experience that mailings could be returned with expired forwarding addresses.  He did not ask TrueBallot if the envelopes had forwarding addresses affixed to them.  Nor did he ask to see the physical copies of the ballot envelopes.  All he did was check the clearly incorrect address against MUMS and the Driver Roster, which did not yield any different information.  That is unsurprising—those were the sources of the incorrect addresses in the first place.  In short, Rubain and Local 1700 made a minimum effort to uncover new addresses for the members whose ballots had been returned as

undeliverable with a forwarding address affixed.  And when that did not succeed, they failed to take alternative, reasonable steps—including using more up-to-date addresses provided to them by USPS—to ensure that the ballots reached all voting members.

Finally, not only were the alternative addresses viable and easily accessible, but using them to resend ballots would have been inexpensive and practical as well.  *See Am. Postal Workers Union*, 486 F. Supp. at 83 (discussing the insuperability of the union's alternatives).  TrueBallot, which had the physical copies of the ballots, easily could have copied and printed the expired forwarding addresses on new ballots.  Costs to Local 1700 would have been limited to the expense of resending 35 ballots, which, based on the costs incurred by the Local to send out the first round of ballots, would have been approximately $243.60.  Pl.'s Mot. at 14.  This is not a case where the union would have been forced "to spend time and money on futile mailings [ ] that have no prospect of reaching their intended recipients."  *Dist. Lodge 720*, 11 F.3d at 1501.

## 2.     *Defendant's Arguments in Opposition*

Defendant contends that "[c]ollectively, [the steps it took before and after the ballots were sent] gave all members of [Local 1700], including the 35 members whose ballot packages were returned with an expired forwarding address affixed to the label, a reasonable opportunity to vote . . . ."  Def.'s Mot. at 15.  The court disagrees.

### i.     The steps taken by Local 1700 before the ballots were mailed were irrelevant and insufficient

Defendant argues that its election-related mailings, particularly the Notice of Election, along with its other modes of notification, were sufficient to ensure its members' right to vote.  Def.'s Mot. at 11-17; Def.'s Opp'n at 14-15; *see also* Hr'g Draft Tr., Mar. 17, 2016, at 26:15-27:2; 29:19-30:14 [hereinafter Draft Tr.].  For that proposition, Local 1700 relies primarily on a non-binding case from the Southern District of Texas in which the court found that "the election notices

posted . . . more than 15 days prior to the mail-out ballots and more than one month before the close of the election, gave each member the knowledge needed to cast his ballot" and that, therefore, "the Defendant provided adequate safeguards to insure a fair election." *Marshall v. Local 4-227, Oil, Chem. and Atomic Workers Int'l Union, AFL-CIO*, 1981 WL 2297, at *3-4 (S.D. Tex. Jan. 8, 1981).

Although *Local 4-227* has not been overruled, it is at odds with other decisions, including one from this district.  In *American Postal Workers Union*, the court rejected the contention that union members were given a "reasonable opportunity to vote" simply because "all eligible persons could have requested ballots."  486 F. Supp. at 83.  And in *Local 290*, the court found a violation of section 401(e) where the union "successfully mailed ballots to over ninety-nine percent of its eligible voting membership."  2008 WL 920337 at *4.  The court simply cannot ascribe to the logic of Defendant's position, which would hold that general notices of an election can absolve a union from taking reasonable steps to correct known errors in its mailing list—errors that, if uncorrected, would result in the disenfranchisement of some of its members.  *See Local 54*, 166 F. Supp. 2d at 113 ("A primary purpose of the election notice provision of the LMRDA and the accompanying regulations is to promote 'maximum participation in union elections.'") (citing *District Lodge 720*, 11 F.3d at 1498).

> ii.   The steps taken by Local 1700 after the ballots were returned were insufficient

As noted, upon receiving the returned ballots, Local 1700 did nothing other than compare the known incorrect addresses against MUMS and the Driver Roster.  That is not enough.

The court finds the decision in *Local 290* persuasive.  There, the union was accused, among other allegations, of neglecting to maintain its mailing list and failing to mail ballots to all eligible voters.  2008 WL 920337 at *2.  Although the court noted that the union "does an adequate job of

updating addresses when it receives notice of a member's address change," it also found that "the [u]nion takes no steps to ascertain a new address when mail is returned as undeliverable." *Id.* at 4. The union receptionist sometimes would attempt to call a member to obtain a new address for that member, but there was no standard action taken by the union. *Id.* The court found the "procedure for mailing ballots [to be] similarly disappointing." *Id.* There, as here, if the union discovered that an eligible member had not been sent a ballot, it would only look in union files to see if a valid address existed for that member. *Id.* at 4. If there was no such address, the member likely was out of luck. *Id.* No other efforts were made to identify a correct address if an address did not exist in the records. *Id.* (noting that if no valid address were found in the member files, the member would not be mailed a ballot, and that "no attempt to contact the member would have taken place by phone, email, or dispatch"). The court in *Local 290* held that such union inaction comprised a section 401(e) violation. *Id.*

Here, where Local 1700 had the actual knowledge that ballots had been returned as undeliverable due to incorrect addresses and also, crucially, had the imputed knowledge that the USPS had provided Local 1700 with those members' more up-to-date forwarding addresses, its decision not to resend the ballots to the expired forwarding addresses unreasonably deprived some of its members of their right to vote. The court is mindful that Congress meant to further the goals of the LMRDA "without departing needlessly from its longstanding policy against unnecessary governmental intrusion into internal union affairs," *Wirtz v. Local 153, Glass Bottle Blowers Ass'n*, 389 U.S. 463, 470-71 (1968), and notes that this failure might not be unreasonable under all circumstances. But in this context—where the union took *no* reasonable steps to determine valid

mailing addresses for the undeliverable ballots—Local 1700 violated section 401(e) when it failed to re-mail the ballots.

Defendant argues that resending the ballots returned as undeliverable with affixed forwarding addresses would not have been a reasonable step because it was "hardly guaranteed that a ballot re-mailed to an expired forwarding address w[ould have] reach[ed] the addressee." Def.'s Opp'n at 14.  To prove this point, Defendant highlights an interview between the Secretary of Labor and one of the 35 members whose ballot was returned as undeliverable with forwarding address expired.  *Id.*  Apparently, this member had moved yet again, so that the address identified as his expired forwarding address was out-of-date.  Defendant contends that "[the member] presumably would not have received the ballot package even if the Local had . . . re-mailed the ballot package to the affixed expired forwarding address."  Def.'s Opp'n at 14.  The member, however, noted that he had put a new forwarding order in place to ensure that mail was sent to his current address.  Pl.'s Mot., Gov Exh 27 [Sealed], ECF No. 20-1, at 10; Pl.'s Mot., Gov Exh 30 [Sealed], ECF No. 23-1.  Thus, contrary to Defendant's representation, it is quite likely that this member would have received his ballot if it had been resent to the expired forwarding address, as it would have been further forwarded to the member from there (assuming that the latest forwarding order had not yet expired).

More importantly, however, the point is that Local 1700 did not take reasonable steps—as required by law—to determine an updated address for this or any other of the 35 members.  And it chose not to use the alternative, more up-to-date addresses that it did have in its possession. Whether or not a union member would, in fact, have received the resent ballots is irrelevant to the question of whether Local 1700 made reasonable efforts to ensure the member's right to vote. Local 1700 was required to take reasonable steps to get the returned ballots with forwarding

addresses affixed to its members.  It did not do so.  "By failing to take reasonable steps to [ ] insure eligible members received ballots, the union disenfranchised a significant segment of its members in good standing and thereby violated Section [401e] of the LMRDA."  *Local 54*, 166 F. Supp. 2d. at 120-21.

### B.     Effect of a Union's Actions (or Non-Action) on the Outcome of the Election

If, as here, the court finds that there has been a violation of section 401, it "establishes a prima facie case that the outcome of the election may have been affected."  *Graphic Commc'ns*, 722 F. Supp. at 784 (citing *Wirtz v. Hotel, Motel and Club Emps. Union, Local 6*, 391 U.S. 492, 506-07 (1968)).  Unless this prima facie case is rebutted by the defendant, the LMRDA "requires a [c]ourt to declare the challenged election void and to require the union to conduct a new election if it finds that a violation of Title IV 'may have affected the outcome of an election.'"  *Id.* at 784 (quoting 29 USC § 482(c)(2)).  Defendant does not contest that its actions—if found to be a violation of Section 401(e)—affected the outcome of the election.  *See generally* Def.'s Mot. at 8 n.9.  Accordingly, the courts finds that Defendant's actions "may have affected the outcome of [the] election."  29 U.S.C. § 482(c)(2).

### C.     Remedy

Having found a violation of section 401(e), the court briefly addresses the appropriate remedy.  At oral argument, both the parties suggested that an appropriate remedy in this case, if the court found a violation, would be to permit the current officers of Local 1700 to serve out their terms and order that the next election—scheduled for later this year—be supervised by the Secretary.  Draft Tr. at 17:6-18:8; 37:9-38:15.

The court doubts that it has the authority to craft such a remedy.  The Labor-Management Reporting and Disclosure Act unequivocally states that, if a court finds a violation of section 401

that may have affected the outcome of the election, it "*shall* declare the election, if any, to be void and direct the conduct of a new election under supervision of the Secretary." *See* 29 U.S.C. § 482(c) (emphasis added).  Courts have construed that remedial provision strictly.  *See Local 153*, 389 U.S. at 474-76 (noting that the LMRDA requires the election to be rerun under the Secretary's supervision); *Am. Postal Workers Union*, 486 F. Supp. at 85 (holding that "the request of the plaintiff . . . that the voided elections be re-run as part of the previously scheduled general elections is inconsistent with the statutory mandate and the clear weight of authority"); *Wirtz v. Local Union No. 1622, United Bhd. of Carpenters and Joiners of Am., AFL CIO*, 285 F. Supp. 455, 465 (N.D. Cal. 1968) ("While defendant has made a strong argument to the effect that no purpose would be served by ordering a new election . . . and the only purpose would be to financially burden the union, we do not have a choice of determining whether or not the relief requested should be granted.  Congress has indicated that once the court has found a violation of the Act has occurred, and that such a violation may have affected the outcome of an election, 'the court shall declare the election to be void and direct the conduct of a new election under the supervision of the Secretary.'" (citations omitted)).

In light of the court's doubts about its ability to craft the requested remedy, the court at this time will withhold entry of judgment and, instead, will request supplemental briefing on the appropriate remedy.  Alternatively, in light of the court's ruling on the merits, the parties may wish to consider a mutually agreeable way to resolve this matter.

## V.     CONCLUSION

For the reasons stated above, the court grants Plaintiff's Motion for Summary Judgment and denies Defendant's Motion for Summary Judgment.  The parties shall submit on or before

April 20, 2016, briefs of no more than 10 pages, double-spaced, which address the appropriate

remedy in this matter.


Dated:  March 30, 2016                                Amit P. Mehta
                                                     United States District Judge